for the appellant, Ms. Bullock, and for the appellee, Mr. Bruno. You may proceed. May it please the Court, Counsel. My name is Ellen Bullock, and I represent Petitioner Appellant Gina Shreve. This appeal arises from a finding of fitness as to Respondent Appellee Amy Jo Gillen, birth mother of H.J.B., a minor, sought to be adopted by her aunt under the Illinois Adoption Act. This appeal involves a mixed standard of review. First, the trial court's interpretation of the unfitness ground of evidence of intent to forego parental rights for 12 months and desertion for more than three months next preceding the filing of the petition for adoption are challenged as a matter of law de novo. For evidence of intent to forego parental rights, there are multiple ways in which the trial court's application of this law violates the plain meaning of the statute, the Illinois Adoption Act's unfitness ground for evidence of intent to forego parental rights. There is an expressly stated time frame of 12 months within the statute, and in the Illinois Adoption Act unfitness grounds, some grounds have time frames and some grounds do not. The grounds that have the time frames it has been held those time frames should be adhered to. Under the plain meaning of that grounds for unfitness, Amy Jo Gillen had 12 months to do three things. She had 12 months to visit the child, communicate with the child although not prevented from doing so by agency or court order, and to maintain contact or plan for the future of the child. So she had three things that she had to do one or more of during the 12 months. During the unfitness proceeding and during the hearing of evidence, Amy Jo Gillen was on the stand and she was asked specifically about a 12 month period and about each of those three things. She was asked during the period 12 months before the filing of the adoption petition, which would have run from July 2010 to July 2011, did you visit the child? No, I did not. Did you communicate with the child? No, I did not. Did you maintain contact or plan for the future of the child? No, I did not. So there the 12 month period is met as far as the actions that are required within that 12 month period. Why does a petitioner want to file a petition? Does she just want to eliminate the mother from the child's life? No, I don't think so. I think she wants to adopt the child so the child has a firm legal standing. The child is getting to be 10 years old. I think the child was originally taken into custody by the grandmother and the aunt for sort of emergency reasons. The birth mother was going into jail. Years passed. The child is now 10. She's lived with first the grandmother but then the aunt, and it's time to have a more permanent custodial arrangement and the love of a family, a permanent family. Why don't you just leave the situation the way it is? Well, I almost think she can't. It was only a temporary custody order. I don't think she can leave the situation. And again, I think some people want to adopt to build their family through adoption, and they may do so if there's unfitness.  Section 50-20A mandates that the court not interpret so as to limit time limits beyond those set forth herein. And I would posit that this 12-month period is one of those time limits that should not be extended outside. It has a meaning within the Adoption Act for unfitness. The Douglas R.S. v. Jennifer R.S. case is interesting in it arose after the fitness hearing and after the briefing of the parties. It arose at the end of the time that the trial judge was writing his opinion. And it is very closely related actually factually all four corners case. There is in that case a putative father who is being sought to be found unfit for evidence of intent to forego his parental rights for 12 months. And then he attempts to raise as affirmative defense matters that are outside those 12 months. And the court in Douglas R.S. says no you can't. It's a line of demarcation. That 12 months acts as a line of demarcation. And matters that occurred outside that line of demarcation are irrelevant. And I would say that Douglas R.S. applies here. For the matters that the court brought up in extenuation or explanation of the mother's not having communicated with her child, not having visited her child, not having contacted her child in the 12 months. The matters that the court brought up were outside that 12 months. So under Douglas R.S. they would be irrelevant. Now the reason they came into the hearing, in case somebody is wondering about the relevancy why it wasn't an objective to a hearing, there was also a grounds failure to maintain a reasonable degree of interest, concern, responsibility, which is a longer time frame. So I think they were relevant to the hearing as a whole, beyond fitness as a whole. But I do not think they could be used, as the trial court used them, to extenuate, defend, or as an affirmative defense, for why she didn't do those three things within 12 months, which the law requires that she must do to manifest her intent. Did the petitioner encourage the child to have contact with the mother? I think the record is clear that they did at times. There was visits as recently as... Didn't the trial court say the petitioner left it up to the child, whether she was going to have contact? No, I think the evidence... I was there actually. I argued the trial court. The evidence was that she had asked the child about her preferences in some of the visiting matters. And the actual end, last visit, was a big part of the proceeding below, was for a birthday. The September 2009 call was for a birthday, and what ended up being said was, you can't see her on her actual birthday because we've got plans, but you can see her after her birthday. That's, I think, how it ended up in the trial court below. And the transcript is in this record, so it's there for the court to check. But the Douglas RS case, I think, goes to this case for exactly that reason. It takes the 12-month limit and it says there are limits in the Adoption Act. There is this line of demarcation. And you can't go outside to find your defense or your excuse. If Amy Gillen had said, during that 12-month period I made a phone call, and they wouldn't let me talk to her. Or during that 12-month period I wanted to see her, but they were telling her that she could make up the decision by herself and said blah, blah, blah. That would be different. That would relate to this 12-month period, at least in the sense of time-wise. But that's not what happened here. This 12-month period is a silent period, an absolutely resounding silence. The birth mother did nothing. She admitted that. Nobody has raised any contrary evidence. The only thing that has been raised is what happened outside of that 12-month period. And I submit that that is barred as a matter of law. Desertion is a lesser form of abandonment. It is an intent to forego some parental rights, but not all parental rights. It has a three-month period, which would be included in that 12-month period. There's another way in which I feel that the trial court's interpretation of the law violated the plain meaning of that law. There is a maxim of statutory construction. I'm going to try my Latin here. Expressio unius et exclusio alterius. And what that means is if the legislature makes a list of items A, B, C, and this item over here isn't in the list, it was meant to be left out. And the intent to forego parental rights includes just such a list. It says that for that 12-month period, if the birth parent failed to communicate with the child, although able to do so and not prevented from doing so by an agency, one, list one, or court order, list two. And I feel that those are the kinds of excuses that could have excused Amy So if the petitioner prevented her from having contact, that doesn't mean anything? I would say no, it doesn't. I don't think, and again, I don't agree and have never agreed that the petitioner created actual obstacles. But with your hypothetical question, agreed. If the petitioner had done something that was an obstruction or an obstacle, that wouldn't count in this list. Well, that sounds sort of odd, doesn't it? Not to me. May Your Honor explain? Not to me it doesn't. May Your Honor explain how it sounds odd? We will consider the actions of the department and whoever, but we won't consider the actions of the petitioner who's bringing this action. Oh, I understand. No, that makes perfect sense. I think it's relevant in that DCFS has a ton of power and it can make binding orders. And that would truly prevent communication with the child. If DCFS is breathing down your neck saying you will not be near this child, you probably are going to listen to DCFS. Same with a court order. As Your Honors know, even a lesser court than yourselves has a lot of power and authority. So if a birth mother is hearing direct court orders, you will not see this child, you're dangerous, there's an order of protection, you cannot go near this child, then that would be reasonable to use that to excuse communication. But a mere custodial aunt, such as did you answer the phone, you know, and act excited to have the phone call, I don't think it does fit in this list and I think it was meant to be excluded from this list. Aunts don't have police forces, they don't have enforcement powers, they just don't have that. This is a slightly different adoption because it was brought independently or adoption of such as is allowed, but it was not brought through the juvenile court process. So it has a different, it arises from a different source. The third way I think there's an expressed language, plain meaning of the law, is in the language of that same intent to forego parental rights grounds, which says the subjective intent of the parent, whether expressed or otherwise, unsupported by evidence of the foregoing parental acts manifesting that intent, shall not preclude a determination that the parent has intended to forego the parental rights. So it says, you know, the intent of the parent, even if it was, if it's not manifested by the foregoing parental acts, and those again are the visiting, communicating, although not prevented by a court order or agency in a contact or planning for the child's future. Those are the three foregoing acts or manifestations. And I think, again, this makes sense. Now Gillen did explain on the stand, Amy Jo Gillen, the mother, did explain her subjective intent. I think I said some things to it. She said, I didn't have regular contact, so I just didn't. I mean it was I was wrong for doing that, I guess. I got discouraged and I quit. I was very discouraged and I didn't do anything. I don't know. Those are subjective. I don't know that they have that much excuse power, but, again, unless there's a manifestation within the proper period and the proper manifestation, I'm not sure those subjective statements, and they don't mean that much, have much meaning. The court looked to, as Your Honor has mentioned, the aunt's sort of alleged obstacles that she placed in the way. Some of them may have, I don't know, the court gets to decide facts, but some of them were reaching. The court decided that the aunt was a legal secretary, so that may have caused fear to the birth mother. It doesn't really hold much water. There was no evidence in the actual record that there was fear. She says, I just got discouraged, I quit. I guess I was wrong for doing that. Even more so, I'm not sure legal secretaries hold that kind of authority or power such as DCFS or a court would hold. There's also evidence that there were some times when the phone wasn't picked up, but there's also evidence from birth mother herself that five times a year she was allowed to talk to the child. So I don't know how that parses out, but it wasn't that she never talked to the child. In that last phone call in September 2009 that allegedly got ugly between the two women, the child did talk to the birth mother during that phone call, both women and men. Whatever happened between them, which they disagreed on, the phone was handed to the child and she talked to the mother. There was no contact after September 2009. There was no attempted contact after September 2009. No phone calls, no letters, no visits, no attempts at phone calls, letters, or visits. There's another grounds that we have on uphill battle, and I imagine maybe opposing counsel will address it, but we have an uphill battle because of the standard of review. For failure to maintain reasonable degree of interest, concern, responsibility, which is a very common grounds of unfitness used in adoptions, the court found it was an extremely close call, but it found that she was fit. In that case, our upstream battle is to show that that finding was against the manifest way of the evidence. We believe that can only be shown if looking at all the evidence, the opposite result was clearly the only result. That unfitness ground does not have the specific time frame, 12 months or three months or anything like that, so it would fall to the child's whole life. Was the September 23, 2009 telephone conversation within the 12-month period? No, it was outside of the 12-month period. The 12-month period ran from the subsequent July to the following July. September 2009, and then the 12-month period began July 2010. I thought the 12-month period begins to run following the mother's final contact with the child. Well, then you could start at September 2009 and it would run to September 2010. Sure, it can, but then it wouldn't matter. There was still no contact in that 12-month period. But the judge can at least consider the September 23, 2009. Well, he clearly did consider that call, I have no doubt, but he can't consider it because the 12-month period, the adoption petition was filed in July of 2011, so I would run the 12-month period backwards to July of 2010. But, and it would be 18 months to run again. But that's not the way you run it, is it? The 12 months runs from the last contact with the child. Well, then you have to run it 12 months, but it has to be empty, because in some last contact you can count it and you can know it's there and you can use it to count, but you've still got 12 empty months because she didn't file her petition until 18 months later. She filed her petition July 2011. So there's still 18 months of no contact. True, but you consider the 12 months from the last contact. So it's September 23, 2009 to September 23, 2010, isn't it? It can be, but what does it matter? The judge gets to consider the phone conversation on September 23, 2009. And he did, he very much did. Well, I thought you were saying he shouldn't. No, no, I'm okay with him considering that, but I'm saying that she had no contact within the relevant 12-month period, because however you measure it, there's 12 empty months. I mean, you have to start empty from somewhere, right? You can't, I mean, 12 months has to. Right. But anyways, it is 18 months from September 2009 when the last contact of any kind occurred until Gina Shreve filed her petition in July 2011. So I was counting the 12 months between July and July, but if you counted September to September, there's still an empty 12 months. And I agree that the court did and should hear evidence on the phone call. It did hear that. For a failure to maintain a reasonable degree of interest, concern, responsibility, or factual grounds, we again take all the evidence and have to argue against it. There's a lot of case law in this grounds of unfitness, more so than the other grounds of unfitness in the Adoption Act, I think. I think one reason there's so much case law is because it's kind of malleable. A lot of different facts can fit in there. But there was some contact, there was some interest, there was some concern, there was some responsibility on the part of this birth mother, especially early on when she first got out of prison for her methamphetamine bust. She was visiting with the child because the grandmother was taking her to school. So there was a visitation and contact early on. In 2008 and 2009, there were three visits that were arranged with the cooperation of Gina Shreve, Karen Baker, and Amy Jo Gillen. So there was some visiting. But that grounds also requires that the interest, concern, and responsibility be maintained and that it be reasonable. So there's some judgment calls and some impact of whether it was maintained. And there again we get to the September 2009, everything stops. No contact, no thinking about contact, and elsewise. As the one thing to say about the psych case that is an important Illinois Supreme Court case as to this very grounds, the failure to contrast our case. In that case, the birth mother wrote eight letters a year, or more perhaps, but at least eight letters a year. And the child's address was not known because they changed the child's  In this case, Gina Shreve's address was known. Karen Baker's address was known. There was no, if visits are somehow impractical, then you can write letters or gifts or cards. There were no letters or gifts or cards since 2005. The only letter was in 2005. It's entered into evidence. It was the same address that Karen Baker still lives at, and there was never another letter since. So phone calls were never impractical. They may or may not have been unpleasant at times, but there were five a year until she stopped trying that reached the child, and no phone number has ever changed. Gina Shreve stayed the same. Karen Baker stayed the same. There's also, we raised again with the manifest weight of the evidence, a habitual addiction to drugs. This is a hard grounds of unfitness to prove. I think it's also a hard thing for birth parents to live through, but habitual addiction to drugs can form unfitness. In this case, Amy Gillan started drugs, or not started taking drugs, she was taking drugs during the beginning of her pregnancy. She was then put into Champaign County Jail. She stopped taking drugs at that point. She got out of jail and she continued taking drugs as she's admitted through her criminal convictions. Now she may have taken other drugs. You only admit what you have to for your criminal guilty plea. You don't go and tell them everything. But she took drugs in May 2001, June 2004, October 2008, April 2009, and then in June 2011, one month before this adoption petition was filed, she was tested positive for cocaine. I see my time is up, and I would like to ask the court that it reverse the decision below and find Amy Gillan unfit for evidence of intent to forego parental rights, desertion, failure to maintain a reasonable degree of interest, concern, or responsibility, and habitual addiction to drugs. You'll have additional time on the rebuttal. Thank you. Bruno? Thank you, Your Honor. May it please the court, counsel. Counsel for appellant addressed the issue of the 12-month period, and there seemed to be some confusion about when the 12-month period led. There shouldn't be, because the 12-month period ought to begin, and it's our position begins at the moment the telephone on September 23rd was handed back to Gina Marie Shreve. That was the line of demarcation, the line of demarcation that was referred to similarly in the Douglas RS case, the last communication with the child. Then the phone call proceeded to, as the record reflects, get ugly, and appellant hangs up on Appali. When she did that, she said something to the effect of, and don't ever call here again. That infects the future in the following way. It causes Amy Jo Gillen to believe, and probably pretty reasonably, that a future phone call would not result in an amicable conversation with her daughter. Was she allowed to talk to her daughter on that occasion? Depends on what you mean by occasion. That phone call, she did. She did speak to her daughter. Then the only adult in the room took the telephone back and told the caller, and don't ever call here again. In essence, don't darken our doorstep. Your daughter doesn't want to talk to you anymore. So this woman who one might view has fought herself back from drug addiction, because I think the evidence is she is, as far as we know, she's doing better now than she was. Yes. She looks healthier now than she was. She fought her way back from drug addiction. She sometimes is employed. She maintains, I think, some contact with other children, has provided support for one of them, is still going, and is still interested in her daughter. Despite that resolve and personal strength, she's put off by a nasty telephone call from doing anything for the next 12, 18 months? She's put off by a situation that doesn't exist with any of her other children. I mention that because it's clear she is interested. It would appear she's interested in her children. Whether that interest is sufficient, that's the question, I suppose. I don't understand somebody who says, I want to, or I think a fact finder could think, what goes on in someone's mind that they think that that's the end of it? Well, you raise a good issue, but in this situation, there was an unbalanced level of power. Indeed, I agree. The adult in the room at the house that the child was living at, had a pretty long lever compared to the one that Amy Jo Gillen had in the telephone call relationship. You can always hang up on someone, but you can't make them answer the phone, you can't make them stay on the phone, and you can't make them hand the phone to an eight-year-old. In this case, she clearly said, don't call here again, and left my client with the impression that it would be a fruitless enterprise to ever do so in the future. It reminds me of something that might happen all the time in this courthouse building. You folks will enter an order, and that order may change the law and exist into perpetuity, and it may exist into a 12-month period or longer. At what point should Amy Jo Gillen have said to herself, I bet if I call today, the phone call will be answered, after being told, don't you ever call here again? Well, she's been told, don't ever take drugs again. She's been told, don't ever violate the law again. And she does. She has. Why does this have more power? Why does this have the power to stop an interest that she claims to have in this child? I'll give you my best response, and that is that even though you're told to follow the law, it's easily breakable. Even though you're told not to use drugs, you can use drugs again. But if you're told not to call here, you don't pick up the phone and think, this time I'll trick her and she'll hand the phone to me again. Now, is there any evidence that the aunt tore up correspondence? Or rejected gifts? Well, what there's no evidence of is that the aunt ever told the 8-year-old that the mother called. No, no, no. I said correspondence. I mean, writing. There is evidence in the record that a letter was written, and it was not given to the child immediately, in my recollection of the evidence, and that it was later given to the child. After the appellant decided it was time to give it to the child. You see, Your Honor, I believe, and my client believes, that the appellant in this case acted as an intermediary, an in-between person, an officious intermeddler, a telephone operator at times, deciding whether to place a call or inform the 8-year-old child of communication from her mother. And in that way, she held the mother-daughter relationship in the palm of her hand. And it's our position that she was irresponsible in the way she handled that. But for the aunt and the grandma, where would this child have been for the last 5 to 7 years? I don't have an answer for that. Oh, I think you do. Somewhere in the system. That may be. Would that be correct? That may be. I actually agree with you in regard to the manner in which communication should have been handled. I think that's poorly done by the aunt. But I also think that it's not appropriate to call her an officious intermeddler, given the care and support that she's provided to this child. And apparently she and her mother are the ones that stepped up, unless there's something else in the record. They're the ones that stepped up when the mother kept finding herself not only in trouble, but incarcerated and addicted or a serious abuser for long periods of time. As I think everyone in the room will agree, the trial court did find this was a very close call on a number of occasions. And the trial court was in the best position to weigh the evidence and come to a final conclusion. And the trial court found that there just wasn't enough evidence to terminate the parental rights of Amy Jo Gill in this case, and found it for a number of reasons. But I want to just say a couple more things. The appellate is correct. The appellate's counsel is correct when she says it's an uphill battle as to reasonable degree of interest, concern, responsibility, habitual addiction to drugs. These are fact-intensive findings that Judge Blockman was in the best position to make a determination on, and he did so very clearly. And I believe it leaves very little room for reversal on those counts. What should happen next? This court should... I mean, assuming we were to affirm, what happens next? Well, this was an adoption petition that was dismissed out of the trial court. Right. And affirming it would end this case. Well, it would end this case. It wouldn't end the problem or the social dynamic as it exists. It's an interesting and complicated case where a child has been outside the presence of her biological mother for a long time. We don't disagree. So your client doesn't have any plans or hopes? Sometimes courts ask, if we rule this way, what will happen in the real world? What will happen outside the bounds of the record?  The record on this case is closed. Tomorrow comes. What does your client want to happen? I don't know what my client wants. That's the answer. I didn't do the trial work in this case, so I can't tell you. I'm not going to represent some of you. I don't know. I appreciate your case. I don't know. There is some confusion, based on my reading of the appellant's brief, about what it means to have occurred. It's one thing, if you're looking at a 12-month period, to say this gentleman or this woman didn't have a car, had her driver's license suspended, got into an accident that caused her to have a long hospital stay. Those are the things you can say, those occurred on July 1st or those occurred on Christmas Day. But when an appellant told Amy Jo Gilland, don't ever call again, and hung up the phone for the sixth time, I would argue that's not something that just occurred in that moment. It occurred the same way a judicial opinion occurs or a court order occurs or a DCF federal order occurs. It happens in an instant, but it lasts for a long time. How long does it last? It depends. But if the 12-month period starts running on September 23rd, as has been suggested, certainly, don't ever call here again, occurs within that 12-month period, and the court so found. The court agreed. These are impediments that last, and they color the whole relationship. A relationship where, as the court said in its opinion, this multiple-time convicted felon with a drug problem and little resources, little wherewithal in the real world, knew an appellant worked for a local law firm, had resources, had more money than she did, and told her, basically, you're not going to get anything out of me, don't bother us anymore. That left Amy Jo Gillen feeling resourceless, and that explains the reasonable finding of the trial court that she did not intend to forego her parental rights. While all of the different points in this case were, many of the different points in this case were close calls, it was a close call because there was a question of how she should interpret that order to never call again. I'm going to stop talking. Any questions? Thank you. In brief rebuttal, the appellee has denied, and denied on the stand that the language, don't ever call here again, took place, but it is the trial court's providence to look at facts, weigh facts. Here's something, the appellee, you're talking about a powerlessness of the mother to call against some authority. The trial court noted this and pointed this out, and I agreed with the trial court and felt the same way. There was always an open F case, which was a paternity custody visitation case, and Amy Gillen never chose to go anywhere near that F case. It was in Champaign County. She was served with the order that made Gina Shreve the temporary emergency custodian in 2005, and in 2005 she was served with that order. She admits she got that order, but she never went back to that case. I've got a question. There are a lot of different animals in the family law area that you can, you know, call something, but this is a, the order in effect now is emergency temporary custody, right? Correct. Which is now seven years old. Usually emergency orders don't last for seven years, let alone come up on appeal in the seventh year. Have either of you given any thought to making the situation for this child somewhat more permanent via guardianship? And with saying, okay, we've got a guardian, we've got opportunities for visitation, we've got a 20-some page order from the trial court that really doesn't resolve the situation? I think Your Honor is right. I think some kind of solution like that may be in the future, but I do not, because I'm an adoption attorney and I'm actually an adoptive mother, I do not undermine that sometimes adoption is the best answer for a child, and it may be the right and proper family solution for a child. Could be. But I also do not argue with Your Honor that guardianship would be better than the emergency temporary custody that exists here. I don't know, I wasn't the lawyer. There will at least be ground rules for everybody to play by. Exactly. And it may well go back. I do want to say something that addresses something opposing counsel said, but also answers Your Honor's question about the real world and Justice Connett asked about the real world. In the real world, Amy Jo Gillen was told at the final hearing, this counsel was not present, her former counsel was present, was told by Judge Blockman, you know, go to that F case. I hear the F cases. Go to that F case and do something and let's get started. I asked for the adoption interim custody order to be extended while we stayed on appeal. He said no. Go ahead. Go to the F case. He even said go to the F case pro se if you wish. Just go to the F case. She hasn't done so. She disappeared again. But I don't think that's evidence you can necessarily consider here. It's outside of the record. But in answer to your real world question, she was given an invitation to go to the F case and she chose not to do so. We haven't heard from her. But I do have one more point I want to make before my time runs out. And again, to what was said by opponent and as to the real world here. There is, I don't think that it is correct to say that Amy Jo Gillen has stopped taking drugs. What happened was she violated her parole in June of 2011 with cocaine and marijuana. That was one month before the adoption petition was filed. She did that in violation of her parole when she knew her liberty was at stake, because she had a criminal conviction for drugs. And she did that when she was living in the house with a 14-year-old child. So I don't think it's accurate and I think it goes against the manifest way of the evidence to say she somehow has shown rehabilitation. She has shown that she went through two different rehabilitation programs, but that raises a chicken and the egg. If you go to rehabilitation and then you relapse, does that show it's good you went to rehabilitation or does it show it's bad you relapsed? I think habitual addiction, as everybody in this courtroom knows, is a terrible problem to fight. I don't wish it on anybody. But I don't think that I am wrong to say that the evidence was really tricky because she had cocaine in her system and violated her probation one month before this adoption petition was filed. And I think you can say, why wasn't she showing attention to the child? Why wasn't she showing interest in the child? Was she afraid of Gina Shreve's ability to pick up the phone and be somewhat nasty? Or was she doing drugs in a way that would violate her probation and put her at risk of going to jail yet again? Cocaine is a serious drug. Thank you, Your Honors. Thank you, counsel. We'll take this matter under advisement and stand in recess until further call.